# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

JAMES MARSHALL,

                             :

           Petitioner,                     Case No. 1:09-cv429

                             :          District Judge Michael R. Barrett
       -vs-                          Magistrate Judge Michael R. Merz

Warden, Ross Correctional Institution,

                             :

           Respondent.

---

# DECISION AND ORDER DENYING MOTIONS TO EXPAND THE RECORD AND FOR EVIDENTIARY HEARING; REPORT AND RECOMMENDATIONS

---

Petitioner James Marshall brings this habeas corpus action *pro se* pursuant to 28 U.S.C. § 2254 to seek relief from his convictions in the Hamilton County Common Pleas Court on counts of murder, involuntary manslaughter, trafficking in and possession of marijuana, and firearm specifications (Petition, Doc. No. 2, ¶ 5, PageID 2).

Marshall pleads the following Grounds for Relief:

> **Ground One:** The judgment of conviction is contrary to law and to the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of the offense beyond a reasonable doubt.

> **Ground Two:** The judgment of conviction is contrary to the manifest weight of the evidence.

> **Ground Three:** The trial court erred to the prejudice of the appellant by denying his motions for judgment of acquittal pursuant

1

to [Ohio] Crim R. 29.

**Ground Four:**  The trial court erred when it allowed the State to present evidence of Appellant's prior act of using a false name in a misdemeanor probation violation case.

**Ground Five:**    Appellant's due process rights were violated because the State committed prosecutorial misconduct during trial.

**Ground Six:**    The trial court erred when it failed to grant Appellant's motion for a new trial.

**Ground Seven:**   The trial court erred to the prejudice of Appellant by imposing a sentence that is contrary to law.

**Ground Eight:**   The judgment of conviction is contrary to law and to the Sixth Amendment to the Constitution of the United States in that Appellant did not receive effective assistance of counsel.

(Petition, Doc. No. 2, PageID 6-15.)

**Ground Nine:**  The 5th and 14th Amendment Rights were violated do [sic] to the Due Process and Equal Protection [Clauses] to the U.S. Constitution.   In that the Trial Court and Appeals Court denied and refuse[d] to grant a motion for leave to file delayed motion for new trial based on newly-discovered evidence.   Pursuant to [Ohio] Crim. R. 33.   This case is one of "actual innocence."

**Ground Ten:**  The Trial Court erred and abused its discretion in violation of Article 1, section 5 and 6 of the Ohio Constitution and violated Petitioners Due Process Right by making his own accusations in that all affiants were part of a scheme. Rather than applying case law to support his findings.

(Motion to Amend, Doc. No. 26, PageID 1646, 1648.)

**Procedural History**

2

Petitioner Marshall was indicted on three separate indictments by the Hamilton County grand jury, all arising from the same set of occurrences. In Case No. B0506040, he and three co-defendants were charged with one count of murder with a firearm specification. In Case No. B0600264, he and one co-defendant were charged with one count of involuntary manslaughter, also with a firearm specification. Finally, in Case No. B0602212, he was indicted on two counts of trafficking in marijuana and one count of possessing marijuana. The indictments were consolidated, but then the co-defendants were severed for trial on Marshall's motion. A jury found him guilty as charged on all counts and specifications. Marshall's pre-sentence motion for new trial was denied and he was sentenced to an aggregated term of imprisonment of twenty-one years to life.

On delayed direct appeal, Marshall pled the following assignments of error:

> 1. The judgment of conviction is contrary to law and to the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that there was insufficient evidence adduced to establish each and every element of the offense beyond a reasonable doubt.

> 2. The judgment of conviction is contrary to the manifest weight of the evidence.

> 3. The trial court erred to the prejudice of appellant by denying his motions for judgment of acquittal pursuant to Crim. R. 29.

> 4. The trial court erred when it allowed the state to present evidence of defendant-appellant's prior act of using a false name in a misdemeanor probation violation case.

> 5. Appellant's due process rights were violated because the State committed prosecutorial misconduct during the trial.

> 6. The trial court erred when it failed to grant appellant's motion for a new trial.

3

7. The trial court erred to the prejudice of defendant-appellant by imposing a sentence that is contrary to law.

8. The judgment of conviction is contrary to law and to the Sixth Amendment to the Constitution of the United States in that the appellant did not receive effective assistance of [trial] counsel.

(Appellant's Brief, Return of Writ, Ex. 19, PageID 279.)   The court of appeals reversed the conviction for involuntary manslaughter, vacated the separate sentences for trafficking in and possession of marijuana, and otherwise affirmed the conviction.   *State v. Marshall*, 175 Ohio App. 3d 488   (Ohio App. 1st Dist. Mar. 7, 2008).   The Ohio Supreme Court declined jurisdiction over a further appeal.

On December 22, 2006, Marshall filed a petition for post-conviction relief under Ohio Revised Code § 2953.21, claiming he had newly-discovered a witness who would exonerate him. The trial court denied relief, the court of appeals affirmed, and the Ohio Supreme Court again declined jurisdiction.

On May 6, 2008, pursuant to the court of appeals' remand, Marshall was resentenced to the twenty and one-half years to life sentence he is now serving.   He supplemented counsel's *Anders* brief on appeal, but the court of appeals found there were no appealable grounds and no further appeal was taken to the Ohio Supreme Court.

Marshall filed his original habeas Petition on June 19, 2009 (Doc. No. 2).   On April 12, 2010, Marshall filed a motion for leave to file a delayed motion for new trial in the Hamilton County Common Pleas Court. On Marshall's Motion and Judge Hogan's recommendation, Judge Barrett stayed this case August 11, 2010, to permit Marshall to exhaust that motion for new trial and/or a successive petition for post-conviction relief based on a claim of actual innocence (Doc.

4

Nos. 20, 22).   On May 15, 2012, Marshall reported to this Court that he had exhausted those state court remedies and moved for reinstatement (Doc. No. 25).   The case was reopened and, Judge Hogan having retired in the interim, the case was transferred to this judge on May 21, 2012 (Doc. Nos. 28, 29).   At the same time, Marshall filed a Motion to Amend (Doc. No. 26) which was granted without opposition from the State (Doc. No. 34).   The Warden also filed a Supplemental Return of Writ (Doc. No. 33) and Marshall has filed a Reply (Doc. No. 37).

### Motion to Expand the Record

Contemporaneous with his Reply, Marshall has filed a Motion to Expand the Record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include a transcript of proceedings before the grand jury (Doc. No. 36).   In the body of that Motion, he says he has "submitted a request for Grand Jury Transcripts pursuant to Habeas Rule 6."   *Id*.   at PageID 3272.   There is no other motion, either pending or previously filed, which seeks discovery of the grand jury transcripts, so this judge reads the Motion as both seeking to have the transcripts produced and then adding them to the record.

A habeas petitioner is not entitled to discovery as a matter of course, but only upon a fact-specific showing of good cause and in the Court's exercise of discretion.   Rule 6(a), Rules Governing §2254 Cases; *Bracy v. Gramley*, 520 U.S. 899 (1997); *Harris v. Nelson*, 394 U.S. 286 (1969); *Byrd v. Collins*, 209 F.3d 486, 515-16 (6th Cir. 2000).   Before determining whether discovery is warranted, the Court must first identify the essential elements of the claim on which discovery is sought.   *Bracy*, *citing United States v. Armstrong*, 517 U.S. 456 (1996).   The burden of demonstrating the materiality of the information requested is on the moving party.   *Stanford v.*

*Parker*, 266 F.3d 442 (6th Cir. 2001), *citing Murphy v. Johnson,* 205 F. 3d 809, 813-15 (5th Cir. 2000). "Even in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or require an evidentiary hearing.'" *Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003)(*quoting Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001.)

Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Williams v. Bagley,* 380 F.3d 932, 974, (6th Cir. 2004), *citing Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997); *see also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). "Conclusory allegations are not enough to warrant discovery under [Rule 6]; the petitioner must set forth specific allegations of fact." *Id., citing Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).

Petitioner has not made any showing or even an argument as to how the grand jury transcripts would be supportive of any of his claims. Furthermore, grand jury proceedings are traditionally kept secret. "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 424 (1983)(*quoting Douglas Oil Co. v. Petrol Stops Northeast*, 441 U.S. 211, 218-219 (1979). Cited favorably in *Rehberg v. Paulk*, 566 U.S. ___, 2012 U.S. LEXIS 2711 (Apr. 2, 2012). In the absence of some showing of relevance to one of the pending claims and materiality, the request to discover grand jury proceedings and then to make them public by including them in the record is DENIED.

## Motion for Evidentiary Hearing

Marshall has also filed, contemporaneous with his Reply, a Motion for Evidentiary Hearing (Doc. No. 38).   Petitioner asserts he is entitled to an evidentiary hearing if the following (3) conditions are met

> (1) A petitioner alleges facts that if proved, will entitle the party to relief;
>
> (2) the petitioners factual allegations survive summary dismissal because they are not palpably incredible or patently frivolous or false;
>
> (3) for reasons beyond the control of petitioner or petitioners attorney (assuming the attorney rendered constitutionally satisfactory assistance), the factual issues were not the subject of a full and fair hearing in the state court or, if a full and fair hearing was held, the hearing did not result in factfindings that resolve all the controlling legal issues.

(Motion, Doc. No. 38, PageID 3302, *citing, inter alia, Townsend v. Sain*, 372 U.S. 293 (1963).)

The law on granting evidentiary hearings in federal habeas corpus has changed materially since *Townsend*.   28 U.S.C. §2254(e) as adopted by the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA") provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.
>
> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that

(A) the claim relies on

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Beyond the AEDPA, on April 4, 2011, the United States Supreme Court decided *Cullen v. Pinholster,* 563 U.S. ___, 131 S.Ct. 1388 (2011), which holds that the results of an evidentiary hearing in federal habeas cannot be used in determining whether a state court decision on the merits of a federal constitutional claim is contrary to or an objectively unreasonable application of clearly established Supreme Court precedent.

Petitioner has not demonstrated that the Court should, in its discretion, grant him an evidentiary hearing pursuant to the now-applicable standards for such hearings.   Accordingly, the Motion for Evidentiary Hearing is likewise DENIED.

## Analysis of the Merits

### Facts as Found by the State Courts

The Hamilton County Court of Appeals found the following facts from the trial testimony:

Junis Sublett was shot by an occupant of a truck at the Pleasant Run Apartments in Springfield Township during the early evening of May 18, 2005. The truck's driver then drove over Sublett's body. Police officers called to the scene found Sublett lying on the pavement near marijuana debris. Shortly after the shooting, the police officers interviewed witnesses, including Sublett's friend Randy Washington.

Washington told the police that he had not seen the shooting but that he had been with Sublett moments before to carry out a plan that he, Sublett, and Sublett's neighbor at the Pleasant Run Apartments, Deangelo Tait, had made to rob Tait's drug dealer during a "drug deal" for two pounds of marijuana. According to the plan, Sublett was to grab the drugs from the dealer and then run to a getaway car where Washington would be waiting for him.

Washington told the police that the dealer arrived in the parking lot of the apartment complex as a front-seat passenger in a green Dodge Durango. Washington stated that after Sublett had entered the Durango, he left to get the getaway car and heard two gunshots.

Washington did not know the dealer's name, but he gave a description and showed the police where the dealer lived. He later viewed a photograph of defendant-appellant James Marshall and identified him as the dealer. Washington did not know the driver of the Durango, but he gave the police a description of him as well.

After the police had discovered that Marshall's sister Sheila owned a Dodge Durango and that she also owned property and had children with a man named Jason Jones, the police obtained a photograph of Jones and placed it in a photographic lineup. Washington immediately identified Jones as the driver of the Durango.

The police later learned that Marshall and Jones were staying in Lincolnton, North Carolina, under the names Antonio Allen and Will Jones. Eventually Marshall was arrested and transported back to Cincinnati. Marshall admitted to being at the shooting but claimed that a man named DC was his driver and Sublett's shooter, and that DC was Tait's cousin.

Marshall, Jones, Tait, and Washington were charged with various offenses. Marshall was brought to trial and convicted of murder, involuntary manslaughter, drug trafficking, and drug possession, all with firearm specifications. He now appeals, raising eight

9

assignments of error.

**The State's Witnesses**

A'Leha Williams, a 14-year-old resident of the Pleasant Run Apartments, testified that she had witnessed Sublett's shooting from the first-floor landing of her apartment building's outside staircase. According to Williams, Sublett was shot in the back of his head as he ran from the passenger side of a "greenish-colored" truck that was approximately 30 to 40 feet in front of her. Williams said that after Sublett had fallen to the pavement, the driver sped off and the vehicle ran over Sublett. Importantly, Williams saw a gun's barrel pointed out the open front-passenger window. She heard two shots fired and saw the victim fall to the ground after the first shot was fired. Williams saw a front-seat passenger and a driver in the vehicle, but she could not identify either and did not see who had fired the shot that killed Sublett. While testifying, Williams was shown a photograph of Sheila Marshall's Durango, and she stated that the Durango looked like the vehicle involved in Sublett's death.

Virginia Banks, also a resident of the apartment complex, testified that she had witnessed the shooting while descending the outside staircase from her third-floor apartment. She thought that she had heard five gunshots when she noticed the victim about two feet from a dark green vehicle. She recalled seeing the victim take a few steps, fall, get back up, and then fall again before he was run over by the dark green vehicle, which then sped out of the parking lot. While testifying, she was shown a photograph of Sheila Marshall's Durango, and she identified the Durango as the vehicle that she had seen run over Sublett.

Washington's testimony at trial was consistent with his statements to the police. He testified that he, Sublett, and Tait had planned to rob Marshall, who had supplied Tait with marijuana in the past. In accordance with the plan, Tait had arranged for Marshall to sell Sublett and Washington two pounds of marijuana in the parking lot of the Pleasant Run Apartments.

Washington waited with Sublett in the apartment complex's parking lot for Marshall's arrival. Washington was expecting Marshall to arrive alone and in a black Chevrolet Monte Carlo that he had previously seen parked in Marshall's driveway. Instead Marshall arrived as a passenger in a green Durango that had been backed into a parking spot. Marshall called Sublett's cellular phone to let him know

10

that he was in the vehicle.

Washington and Sublett approached the vehicle together. Sublett entered the vehicle to get the drugs and sat in the back seat behind Marshall. Washington stood outside the vehicle on the driver's side until he noticed that the driver looked nervous and was reaching for the middle console, possibly to retrieve a gun. Washington then walked to the passenger side and saw two pounds of marijuana on Marshall's lap. Washington eventually went to a nearby breezeway to wait for Sublett's signal for him to get the getaway vehicle that was parked in a different parking lot. Sublett gave the signal, but as Washington proceeded to the getaway vehicle, he heard two gunshots and a vehicle speeding off. Washington returned to the parking lot where the drug transaction had taken place and saw Sublett lying on the pavement next to a white grocery bag containing two bags of marijuana. Washington called an ambulance and then removed the marijuana, giving it to a neighbor.

Washington claimed that the robbery plan did not call for the use of a gun. Rather, Sublett was to grab the marijuana and run. Washington also stated that he knew Sublett owned a gun but that he did not know that Sublett had his gun with him that day. On cross-examination, Washington admitted that, after he had heard the gunshots, he thought Sublett might have had the gun with him.

Washington confirmed his prior identification of Marshall and Jones, and he also identified Sheila Marshall's green Durango as the vehicle that Jones had been driving. Washington admitted to the jury that he had been indicted for his role in Sublett's murder and that he hoped to receive leniency because of his testimony against Marshall.

Deangelo Tait testified that he had called Marshall around 2:45 p.m. on the day of the murder to set up a marijuana sale for himself, Randy Washington, and Junis Sublett. Tait claimed that Marshall was to sell two pounds to Washington and Sublett before meeting with him for the sale of half a pound. Additionally, he testified that he was not related to and did not know of anyone named DC.

Tait admitted that he had prior felony convictions. Also, he explained that the state had initially charged him with murder relating to Sublett's death, but that the murder charges were dropped in exchange for his guilty plea to involuntary manslaughter. The court had imposed an agreed two-year term of imprisonment, but the plea bargain included the state's reservation of the discretion to seek a

lesser sentence.

Springfield Township Police Officer Daniel D. Carter testified that he had received a radio dispatch for shots fired at the apartment complex at 6:58 p.m. on the night of the murder. He and his partner, Nick Peterson, were the first officers to arrive at the scene. Carter observed Sublett's body on the pavement in the path of passenger-side rear-tire marks that ran in a northwest direction out of a parking spot. Paramedics took Sublett to the hospital, where he was pronounced dead.

In the vicinity of Sublett's body, Carter noticed marijuana debris, a bloodied white plastic bag, a broken cellular phone, and blood. Additionally, Carter observed a bullet hole in the radiator of a vehicle parked diagonally from where the Durango had been parked. Carter observed that the bullet had traveled in a northwest direction. Carter used a diagram and photographs to demonstrate the crime scene upon his arrival.

Kristin Carter, a nurse, testified that Sublett had arrived at the hospital fully clothed and that she had recovered a gun from Sublett's front pants pocket. Carter gave the fully loaded revolver to the police.

Hamilton County Chief Deputy Coroner Gary Utz testified that Sublett had received a fatal gunshot wound to his skull. The bullet had entered the left side of Sublett's skull behind and above his left ear and exited from the skull in front of and above his right ear, likely rendering Sublett incapable of purposeful movement.

Utz opined that Sublett was facing away from and was standing at least two feet from the gun when he was shot. Additionally, he testified that Sublett's wound could have been produced by a fully jacketed 9-mm Winchester bullet. Finally, Utz testified that Sublett had injuries indicating that he had been run over by a vehicle.

Springfield Township Police Detective Patrick Kemper took Washington's statement on the night of the murder. He first testified that Washington had told him that one of the occupants of the vehicle had a semiautomatic weapon. Later, after reviewing his notes, Kemper testified that his notes indicated that Washington had told him only that the driver had been reaching towards the center console for something, possibly a gun.

Kemper also relayed that he had had several short telephone

12

conversations with Marshall before his arrest, and that during these conversations Marshall had not mentioned the name DC.

Kemper went to the crime scene several days after the shooting and looked for a spent casing and bullets. He found a spent 9-mm casing in the grass two inches from the parking lot, in an area where he would have expected to find a casing ejected from a semiautomatic weapon fired out the front passenger window of the vehicle. Kemper used measurements and photographs from the crime scene to create a diagram that depicted the location of the physical evidence, including Sublett's body, blood stains, tire marks, marijuana, the spent casing, and the parked vehicle that had been struck with a bullet.

Springfield Township Police Detective James Ohl testified about the violence associated with drug dealing and his investigation of Sublett's murder. Ohl stated that photographs introduced by the state accurately depicted what he had seen when he arrived at the crime scene at 7:15 p.m. He told the jury that he had collected what resembled marijuana debris from the parking lot near Sublett's body, and that it had been tested and determined to be 6.57 grams of marijuana.

He further testified that Washington had provided the police with Marshall's address, and that although Washington did not know Marshall's name, he described him as a "white Mexican." From the address, the police obtained Marshall's name, and Washington identified Marshall from a photograph. The police looked for Marshall's name in a LexisNexis police database. This database returned the name of Sheila Marshall, Marshall's sister. And by entering Sheila Marshall's name into the database, Ohl obtained Jason Jones's name, as Jones and Sheila Marshall were in a relationship and owned property together, including a house in West Chester, Ohio. Ohl discovered that Sheila Marshall owned a green Dodge Durango, which was the vehicle described at the scene. But police driving by the West Chester residence observed only a black Monte Carlo in the driveway.

Ohl further testified that, on May 20, 2005, he had received word that Sheila Marshall had been stopped on Interstate 75 while driving the Durango. Ohl responded to this scene and inspected the interior of the vehicle. Ohl described the interior as newly cleaned and containing new pink seat covers, new floor mats, and new stickers. He had the vehicle towed to the Springdale Police station and tested

13

for forensic evidence such as transfer of blood, skin, and clothing. The test results were inconclusive.

Ohl received permission from Sheila Marshall to search the West Chester residence that she shared with Jones. Numerous documents addressed to and pertaining to Jones were found in the residence. Additionally, the search yielded 429 pounds of marijuana that had been compressed into bricks and stored in two freezers. The police also found guns and ammunition, as well as a magazine clip loaded with fully jacketed 9-mm Winchester bullets. The police did not locate the gun designed to use the magazine. But Ohl testified that the spent casing found in the grass at the Pleasant Run Apartments was similar in caliber to and bore the same head stamp as some of the ammunition found in the residence.

Ohl was unable to locate Marshall and Jones after the shooting. In early June, Ohl contacted officers in Lincolnton, North Carolina, because Marshall's family members had been receiving frequent phone calls from the area. The calls had been made from a cellular phone registered to an Antonio Allen. Ohl sent the Lincolnton officers photographs of both Marshall and Jones, and asked them to investigate an address that he had provided.

After receiving word that Marshall had been apprehended in Lincolnton, Ohl traveled there to interview Marshall. According to Ohl, Marshall admitted to being the passenger in the vehicle involved in the shooting but claimed that Sublett had been robbing him at gunpoint and had ordered him to put his head between his knees. He also denied that Jones had been the driver and claimed not to know Jones very well. He implicated a man named DC as the shooter but did not provide a description of the man other than that he was "Deangelo's cousin" and that he drove a green GMC Yukon or Chevrolet Suburban with a Tennessee license plate.

Finally, the state offered the trial depositions of two Lincolnton police officers who had found Marshall hiding in woods near the address Ohl had provided to them. The officers testified that Marshall had identified himself as Antonio Allen. The officers testified that they did not find Jones with Marshall when they apprehended him, but that one officer had encountered Jones, who was using the name Will Jones, at the designated address in North Carolina during an unrelated investigation.

14

**Marshall's Witnesses**

At trial, Marshall testified that when Sublett was shot, he was a passenger in a vehicle driven by a man named DC, and that they were in the parking lot of the Pleasant Run Apartments to sell two pounds of marijuana to a man named Brandon. Marshall claimed that his friend Deangelo Tait had called him earlier in the day to set up the sale. Marshall was to receive $150 from the transaction, which included $50 that Tait had previously owed him.

Marshall described DC's vehicle as a dark green Chevrolet Tahoe truck with a Tennessee license plate on the front. According to Marshall, after DC had parked the Tahoe, Marshall noticed Sublett and Washington, whom he did not know, standing nearby. Marshall tried to call Brandon, and either Sublett or Washington answered the call and asked whether Marshall was in the truck. When Marshall said yes, the men walked up to the truck. Marshall claimed that he sensed that they were about to be robbed and that he told DC to drive away. DC replied, "It's cool, I got this."

Marshall asked Sublett and Washington why Brandon was not there and was told that he was in the house. Sublett and Washington then asked to see the marijuana because they were going to share the marijuana with Tait. DC told Sublett to get in the vehicle. Washington remained outside the vehicle. DC retrieved a bag of marijuana from underneath the driver's seat and handed it to Sublett, who was in the back seat. Washington then walked away from the vehicle to the breezeway of the apartment building.

Sublett began negotiating a price, but then he pulled out a gun and indicated that he was robbing them. Marshall put his head between his legs after Sublett had ordered him to do so. Marshall heard DC tell Sublett to take the drugs and saw, after turning his head to the right, that DC had his hands up in the air. Then, according to Marshall, Sublett exited from the vehicle while indicating that he wanted to take Marshall's and DC's personal belongings. Marshall claimed that, when he looked up again, he saw that Sublett was aiming a revolver, held in his right hand, at Marshall's head. Sublett was also holding the bag of marijuana in one of his hands while he attempted to unlock the front passenger door through the open window. Marshall then heard two gunshots, and the vehicle sped away. He looked at DC and saw that he had a gun in his hand. Then he sensed that the vehicle had run over something while exiting from the parking lot.

15

Marshall claimed that DC then pointed the gun at him and accused him of helping to plot the robbery. Marshall directed DC to the expressway, where they traveled south. After crossing the bridge into Kentucky, they came upon a traffic jam. Marshall said that he jumped out of the vehicle and walked to a nearby restaurant.

Later, his friend Ryan Alexander met him, and they spent the night at Alexander's home. The next day, Alexander drove him to Louisville, where he met Jones at a hotel. While in Louisville, Alexander was involved in a car accident, and Jones drove Alexander to Cincinnati. Marshall remained in Louisville until Jones called him and told him to return to Cincinnati by bus. According to Marshall, Jones wanted Marshall to return because news agencies were naming Jones as a suspect in Sublett's murder. Jones met Marshall at the bus station, and they stayed at a friend's home that night. The next morning, they met with an attorney who advised them to surrender to the police. Marshall told the jury that they had decided against that because they did not know DC's identity. Therefore, they decided to go to North Carolina for a short time.

Marshall told the jury that he had used the alias Antonio Allen while in North Carolina and explained that he had used this name, with the consent of the real Antonio Allen, for several months prior to Sublett's death to avoid prosecution for a probation violation. He also acknowledged that he had several felony convictions.

Marshall confirmed that he had short phone conversations with Detective Kemper before his arrest and that he had given Kemper an account of the shooting. He reviewed Detective Kemper's summary of the conversation and claimed that Kemper had for the most part captured the "full conversation." But on cross-examination, he said that the summary omitted his mention of Brandon and DC and incorrectly indicated that he had told Kemper that Sublett had shot first.

With regard to his post-arrest interview, Marshall said that he had told Detective Ohl about DC, but that Ohl had not asked him for a physical description of DC. Marshall conceded that he had never volunteered a description.

Finally, on cross-examination, Marshall agreed with the state that a drug deal was a dangerous transaction.

16

Ryan Alexander testified and confirmed that he had driven Marshall to Louisville, where they had met Jones, and that Jones had driven him back to Cincinnati because his own vehicle had been damaged in a car accident.

**Rebuttal**

The state called Detective Ohl to rebut Marshall's testimony that the green vehicle he had ridden in bore a front license plate from the state of Tennessee. Ohl testified that the state of Tennessee did not use front license plates.

After the jury had found Marshall guilty on all counts, Marshall moved for a new trial on the basis that a previously unknown eyewitness, Yolanda Bailey, had come forward. The trial court overruled the motion after holding an evidentiary hearing at which Bailey testified. The court then sentenced Marshall to an aggregate term of twenty and one-half years to life in prison.

*State v. Marshall*, 175 Ohio App. 3d at ¶¶ 1-44.

In his Reply, Marshall offers rebuttal to these presumptively correct findings.

First of all, he objects to the finding at ¶ 2 that "[a]ccording to the plan, Sublett was to grab the drugs from the dealer and then run to a getaway car where Washington would be waiting for him." Marshall wants this Court to find from the testimony that Sublett was supposed to signal Washington who would then bring the getaway car around and pick Sublett up.

The context makes it clear that the court of appeals is reporting Washington's testimony in the quoted language. On cross-examination by Marshall's counsel, Washington testified:

> Q. And so he was going to run to the car over there where you had it parked?
>
> A. I don't remember what the exact – I don't know if I was going to come to him or if he was going to run back down. I'm not sure.

(Trial Tr. 514, PageID 1050.)   This testimony supports either conclusion as to what the plan was or

17

that there was no firm plan as between Washington and Sublett exactly what would happen after Sublett got the marijuana from Marshall. Washington's admissions on cross-examination make it plain that Sublett and Washington planned a robbery and that Washington had a firearm. But the testimony also contains no admission that Sublett had a gun[1] and Washington expressly testified that no shooting was supposed to happen. Marshall believes it is critical that this Court distinguish between a "snatch and grab" and an armed robbery, but Washington was indicted for robbery, not aggravated robbery. And a "snatch and grab" is consistent with a charge of robbery because any use of force will turn a simple theft into a robbery under Ohio law. Marshall's citations to the record do not overcome the court of appeals' finding by clear and convincing evidence and, in any event, the difference between whether Sublett was going to run to Washington at a fixed location or whether Washington was going to be picking Sublett up are not material to the outcome.

Marshall's next claim about the court of appeals findings relates to the testimony of A'leha Williams. The relevant finding is "A'leha Williams testified that she had seen the gun used to kill Sublett pointed out of the Durango's front passenger window." *State v. Marshall,* 175 Ohio App. 3d 488 at ¶ 48. To show that this finding is clearly erroneous, Marshall points to Ms. Williams' testimony at trial transcript pp. 338-339, but that portion of the transcript does not include the testimony he refers to or any testimony about the murder weapon. In any event, the point Marshall wants to make is that "Ms. Williams clearly clarified she didn't see the gun outside the window." (Reply, Doc. No. 37, PageID 3279.) The court of appeals finding does not say she saw the gun outside the window; it says she saw the gun pointed out the window.

In sum, upon careful examination of the transcript portions pointed to by Marshall, the Magistrate Judge finds he has not overcome the presumption of correctness for the court of appeals'

---

1 A gun was found in Subletdt's pants pocket by the nurse at the hospital to which he was taken.

findings by clear and convincing evidence.

## Grounds One and Three: Insufficient Evidence

In his First Ground for Relief, Marshall asserts he was convicted on insufficient evidence. In his Third Ground for Relief, he asserts the trial court erred in not granting his motion for judgment of acquittal which is the legal equivalent of asserting there was insufficient evidence. The Hamilton County Court of Appeals decided these claims, along with the manifest weight claim, on the merits as follows:

> In his first three assignments of error, Marshall argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and that the trial court erred in overruling his Crim.R. 29 motions for an acquittal. We address these assignments of error together.
>
> When reviewing the record for the sufficiency of the evidence, this court must view all the evidence presented in the light most favorable to the state and determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. The same standard is employed to determine whether a trial court properly overruled a Crim.R. 29 motion for an acquittal. But when reviewing the manifest weight of the evidence, this court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541.
>
> Marshall was convicted of murder, in violation of R.C. 2903.02(A); involuntary manslaughter, in violation of R.C. 2903.04(A); drug trafficking, in violation of R.C. 2925.03(A)(1) and 2925.03(A)(2); and possession of marijuana, in violation of R.C. 2925.11(A). He was also convicted of a three-year firearm specification for the murder and a one-year firearm specification for each of the other

offenses.

Marshall first argues that the state did not present sufficient evidence to place the murder weapon in his hand. We disagree. A'leha Williams testified that she had seen the gun used to kill Sublett pointed out of the Durango's front passenger window. Washington testified that Marshall was the front-seat passenger. Marshall's testimony corroborated both of these facts. Thus, Marshall was there, and he was in a position to be the shooter. The state may use circumstantial evidence to prove its case, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492. and we hold that the evidence in this case, when viewed in the light most favorable to the state, was sufficient to support a finding that Marshall had shot Sublett.

Next Marshall argues that the state failed to prove that the killing was purposeful, as required for a murder conviction under R.C. 2903.02(A). But the state's evidence at trial demonstrated that Marshall had shot Sublett in the head as Sublett was moving away from the Durango with his fully loaded gun in his pocket. The coroner stated in his autopsy report and in his direct testimony that Sublett was at least two feet away from the gun when he was shot and that "the projectile traveled left to right, back to front, and upward." This evidence was sufficient for the jury to conclude that the killing was purposeful. Although the coroner misstated the direction of travel as "front to back" on cross-examination in response to a question concerning whether there was an upward swing to the bullet path, the bullet, which unequivocally entered behind Sublett's left ear and exited in front of and above Sublett's right ear, had to travel in a back-to-front direction.

 [**P50]  Marshall also specifically challenges the sufficiency of the state's evidence to support the involuntary-manslaughter conviction. To establish the offense of involuntary manslaughter, the state was required to establish that Marshall had caused Sublett's death as a proximate result of his commission of or attempt to commit the felony of trafficking in drugs. A portion of the jury instructions regarding proximate cause stated as follows:

> "A proximate result of an alleged criminal act is one that would not have occurred but for the act, and it was reasonably foreseeable as directly, naturally, and logically within the scope of the risk created by the act."

20

Marshall argues that Sublett died as a proximate result of his own criminal behavior, and, thus, that Sublett did not die as the proximate result of Marshall's drug trafficking. He also argues that the state failed to prove that Sublett's death was reasonably foreseeable, because Marshall did not know that he was going to be robbed.

Marshall misinterprets the standard for proximate result, which, as used in the involuntary-manslaughter statute, is equivalent to proximate cause. *State v. Robinson,* 1st Dist. No. C-060434, 2007 Ohio 2388, at P25. The proximate-cause element is satisfied when the accused sets in motion a sequence of events that makes the death of another a "direct, proximate, and reasonably inevitable consequence." *State v. Lovelace* (1999), 137 Ohio App.3d 206, 215, 738 N.E.2d 418, quoting *State v. Chambers* (1977), 53 Ohio App.2d 266, 272-273, 373 N.E.2d 393. Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context. *Id.* . at 215-220.

To establish proximate causation, the state presented evidence that the death of Sublett would not have occurred that evening if Marshall had not set up the drug transaction, and that drug transactions were dangerous endeavors that could often lead to robbery or even deadly violence. Marshall's own testimony corroborated testimony from several state's witnesses on the dangers associated with drug transactions. We conclude that this evidence was sufficient to establish proximate cause.

After reviewing all the evidence presented at trial, we hold that Marshall's convictions for murder, involuntary manslaughter, drug trafficking, drug possession, and the firearm specifications were supported by sufficient evidence.

Marshall also claims that the greater weight of the evidence, including his own testimony, demonstrated that the driver was the shooter. We are not persuaded, as the evidence permitted a conclusion that would have excluded the driver as the shooter. The state argued that, due to the location of Sublett and the Durango when Sublett was shot, the driver would have had to fire through the front windshield to strike Sublett, even if he were leaning over the passenger seat. Further, all the observed evidence, including the discovery of a spent casing outside the Durango and the quickness with which the driver "skirted" off after the shooting, supported the state's theory that the passenger, not the driver, was the shooter.

21

With regard to all of Marshall's convictions, we note that the jury was able to personally view the demeanor of the witnesses and, therefore, was in the best position to judge their credibility. The jury was free to reject Marshall's testimony, as it was contradicted in many respects by the physical evidence and testimony from the state's witnesses. Marshall's credibility was further harmed by his contradictory prior statements and his flight after the crimes. Moreover, Marshall's prior felony convictions and his previous use of an alias to avoid prosecution for a probation violation were factors that the jury could have considered in determining whether he was telling the truth.

We cannot say that the evidence weighed heavily against Marshall's convictions and that the jury lost its way in finding Marshall guilty of the offenses.

Following our review of the record, we conclude that Marshall's convictions were supported by sufficient evidence, that the trial court did not err in overruling Marshall's motions for an acquittal, and that Marshall's convictions were not against the manifest weight of the evidence. Accordingly, the first, second, and third assignments of error are overruled.

*State v. Marshall*, 175 Ohio App. 3d 488, ¶¶ 45-59.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 785 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000).

When the claim is insufficiency of the evidence, two layers of deference are required.

We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier

22

> of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U. S.
> 1, ___, 132 S. Ct. 2, 181 L. Ed. 2d 311, 313 (2011) (*per curiam*). And
> second, on habeas review, "a federal court may not overturn a state
> court decision rejecting a sufficiency of the evidence challenge
> simply because the federal court disagrees with the state court. The
> federal court instead may do so only if the state court decision was
> 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U. S.
> ___, ___, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010) (slip op., at 5)).

*Coleman v. Johnson*, 566 U.S. ___, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012)(*per curiam)*; *accord Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009).

Marshall's argument on insufficiency of the evidence is directed only at the murder conviction.   His theory seems to be that Jason Jones was the driver and also the person who shot Sublett.   He offers alternative explanations about how the driver could have done the shooting, why Sublett's body fell the way it did, and so forth.

However, the jury was entitled to believe A'leha Williams who testified that Sublett was shot in the back of his head as he ran away from the Durango.   Washington, who was also charged, testified consistent with his pre-trial statements to the police.   He admitted planning to rob Marshall and Jones.   He knew Sublett owned a gun, but did not know Sublett had it with him at the time.   The deputy coroner testified the bullet entered Sublett's skull from behind.

Marshall's testimony at trial was that his accomplice in the drug deal and Sublett's shooter was a fictitious person named D.C.   He now admits the driver was Jason Jones.   He also admitted he used a fictitious name while a fugitive in North Carolina.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358   (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc).   In order

23

for a conviction to be constitutionally sound, every element of the crime must be proved beyond a

reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the
> light most favorable to the prosecution, any rational trier of fact
> could have found the essential elements of the crime beyond a
> reasonable doubt . . . . This familiar standard gives full play to the
> responsibility of the trier of fact fairly to resolve conflicts in the
> testimony, to weigh the evidence and to draw reasonable inferences
> from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006);

*United States v. Somerset*, 2007 U.S. Dist. LEXIS 76699 (S.D. Ohio 2007). This rule was

recognized in Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E. 2d 492 (1991). Of course, it

is state law which determines the elements of offenses; but once the state has adopted the

elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

Someone from inside the green Durango shot Junis Sublett in the back of the head when he

was several feet from the truck. At trial Marshall said it was "D.C.," a story he now repudiates.

The court of appeals noted that the jury had heard contradictory evidence, but was able to view the

demeanor of the witnesses and was free to reject Marshall's testimony because it was contradicted

in many respects and Marshall's general credibility was reasonably undermined. There was

competent evidence to support the conclusion that Marshall shot Sublett in the back of the head,

behavior completely sufficient to prove intent to kill even if Sublett had been fully armed and

robbed Jones and Marshall at gunpoint.

Grounds One and Three are without merit and should be dismissed with prejudice.

### Ground Two:   Manifest Weight of the Evidence

In his Second Ground for Relief, Marshall asserts that his convictions are against the manifest weight of the evidence.   As the Warden asserts, this is not a claim which is cognizable in federal habeas corpus.   That is, no clause of the United States Constitution guarantees that one cannot be convicted against the manifest weight of the evidence.

In *State v. Thompkins,* 78 Ohio St. 3d 380 (1997)*,* the Ohio Supreme Court reaffirmed the important distinction between appellate review for insufficiency of the evidence and review on the claim that the conviction is against the   manifest weight of the evidence.       It held:

> In essence, sufficiency is a test of adequacy.   Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.   *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102, 387 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.   Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.   *Robinson, supra*, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149.   Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.   It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.   Weight is not a question of mathematics, but depends on its effect in inducing belief."   (Emphasis added.)
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony.   *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661.   See, also, *State v.*

> *Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The   court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

78 Ohio St. 3d at 387.   In *State v. Martin*, 20 Ohio App. 3d 172 (Hamilton Cty. 1983)(cited approvingly by the Supreme Court in *Thompkins*), Judge Robert Black contrasted the manifest weight of the evidence claim:

> In considering the claim that the conviction was against the manifest weight of the evidence, the test is much broader.   The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

485 N.E. 2d at 718, ¶3 of the syllabus.   The consequences of the distinction are important for a criminal defendant.   The State may retry a case reversed on the manifest weight of the evidence; retrial of a conviction reversed for insufficiency of the evidence is barred by the Double Jeopardy Clause.   *Tibbs v. Florida*, 457 U.S. 31(1982).

Because Ground Two does not state a claim cognizable in habeas corpus, it should be dismissed on that basis.

26

**Ground Four:   Improper Introduction of Evidence**

In his Fourth Ground for Relief, Marshall asserts the trial court improperly admitted evidence that he had used a false name when confronted by police in North Carolina and admitting evidence of 429 pounds of marijuana found at the home Jones shared with his sister, Sheila Marshall.

Federal habeas corpus is available only to correct federal constitutional violations.   28 U.S.C. §2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*;Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983).    "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Evidentiary questions generally do not rise to the constitutional level unless the error was so prejudicial as to deprive a defendant of a fair trial.   *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988);   *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir. 1983);   *Bell v. Arn,* 536 F.2d 123 (6th Cir., 1976); *Burks v. Egeler*, 512 F.2d 221, 223 (6th Cir. 1975). Where an evidentiary error is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief. *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007); *Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003), *citing Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2000).   Courts have, however, defined the category of infractions that violate fundamental fairness very narrowly. *Bugh, quoting Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)(*quoting Dowling v. United*

*States*, 493 U.S. 342, 352 (1990)). "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000)(*quoting Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003), noting that the Supreme Court refused to reach the issue in *Estelle v. McGuire*.

Thus these two claims about irrelevant evidence, which were presented to the state courts as questions of Ohio law, are not properly before this Court on the merits of any federal constitutional question.

In the alternative, however, there was no fundamental unfairness in admitting this evidence. Marshall's use of an alias to avoid identification and arrest was clearly relevant to his consciousness of guilt. And the large quantity of marijuana was relevant to show that Jones and Marshall were engaged generally in the business of dealing in marijuana, one of the charges made against Marshall.

Ground Four should be dismissed with prejudice.

## Ground Five:   Prosecutorial Misconduct

In his Fifth Ground for Relief, Petitioner asserts various acts of the prosecutor constituted unconstitutional misconduct. These claims were Marshall's fifth assignment of error on direct

28

appeal on which the Hamilton County Court of Appeals held:

> In his fifth assignment of error, Marshall argues that his due-process rights were violated by prosecutorial misconduct three times during the trial. First, Marshall claims that the prosecutor improperly stated in closing argument that Marshall had "acted in conformity with his prior convictions." But Marshall cites the prosecutor's argument to the jurors that, in determining whether to believe Marshall's or Washington's identification of the driver, they should consider that Marshall used a false name in the past to subvert justice. Although Marshall characterizes it otherwise, this comment by the prosecutor did not maintain that Marshall had acted in conformity with his prior convictions. Rather the prosecutor's comment, which was based upon Marshall's own testimony that he had used an alias prior to the shooting to avoid prosecution for a probation violation, was proper commentary on Marshall's character for truthfulness. See [Ohio] Evid. R. 608(B).

> Next, Marshall claims that the prosecutor knowingly presented false evidence at trial when Washington testified that he did not know whether Sublett had a gun. According to Marshall, Washington had previously told the grand jury that Sublett had a gun.

> As noted by the state, the grand-jury transcript is not a part of the record, a deficiency that prevents this court from substantiating Marshall's claim about what Washington had told the grand jury. Moreover, our review of Washington's trial testimony, including his cross-examination, demonstrates that Washington told the jury at trial that he knew Sublett owned a gun but that he did not know whether Sublett had brought it to the robbery. He even conceded that when he heard the gunshots, he considered that Sublett might have brought his gun and fired the shots. Thus, Marshall's attorney thoroughly cross-examined Washington and effectively impeached him on the issue raised. Finally, Marshall has not cited any authority to support his assertion that inconsistent testimony by a witness demonstrates that a prosecutor has presented false evidence.

> Marshall also claims, *citing Brady v. Maryland,* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215,  that the prosecutor committed misconduct by failing to disclose Yolanda Bailey as a witness pursuant to Marshall's discovery request. In *Brady*, the Supreme Court held that "suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." *Id.* at 87. Favorable evidence under *Brady* encompasses both exculpatory and impeachment evidence, and the evidence must be both favorable and material before disclosure is required. *United States v. Bagley* (1985), 473 U.S. 667, 674, 105 S.Ct. 3375, 87 L. Ed. 2d 481.

Bailey unequivocally testified at the hearing on the motion for a new trial that she had told the police that she did not see the shooting. Where this statement was not material and favorable to Marshall, the state did not violate Brady by not disclosing it.

We find no merit to Marshall's claim of prosecutorial misconduct. Accordingly, we overrule the fifth assignment of error.

*State v. Marshall*, 175 Ohio App. 3d 488 at ¶¶ 65-70.

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright,* 477 U.S. 168 (1986); *Wogenstahl v. Mitchell*, 668 F.3d 307, 327-328 (6th Cir.  2012), *citing Smith v. Mitchell,* 567 F.3d 246, 265 (6th Cir. 2009); *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); *accord Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983).  The court must first decide whether the complained-of conduct was in fact improper. *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *citing United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)  A four-factor test is then applicable to any conduct the Court finds inappropriate: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made;

and whether the evidence against the defendant was strong." *Id.*  The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).  The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993)(*quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56 (*quoting Angel*, 682 F.2d at 608).  The misconduct must be so gross as probably to prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 572 (1997); *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988).  Claims of prosecutorial misconduct are reviewed deferentially on habeas review.  *Thompkins v. Berghuis,* 547 F.3d 572 (6th Cir. 2008), *citing Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

Marshall does not demonstrate in his Reply any way in which the court of appeals' decision on his fifth assignment of error was contrary to or an objectively unreasonable application of the Supreme Court precedent applicable to prosecutorial misconduct claims.  Marshall's use of an alias was not used as propensity evidence, but as credibility evidence.  The court of appeals correctly noted that it is not proof of suborning perjury when a State's witness gives contradictory testimony, particularly where, as here, he is himself charged with serious crime arising out of the same incident.  Finally, the court of appeals properly characterized Yolanda Bailey's evidence as

not material and therefore not disclosable under *Brady, supra*.

Ground Five for Relief should be dismissed because the court of appeals' decision is entitled to deference under AEDPA.

## Ground Six:   Failure to Grant a New Trial

In his Sixth Ground for Relief, Marshall asserts he is entitled to a new trial and the state courts erred in denying him one when he first asked for one before sentencing.   This claim was before the court of appeals when it first heard the case; it held:

> To warrant the granting of a new trial based on newly discovered evidence in a criminal case, it must be shown that the new evidence "(1) discloses a strong probability that it will change the result if a new trial is granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus. The decision whether to grant a new trial on the ground of newly discovered evidence falls squarely within the discretion of the trial court. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227.

> At the hearing on the motion for a new trial, Marshall presented an affidavit and testimony from Yolanda Bailey. Bailey lived next to Tait in the apartment complex. She claimed that she had seen the driver of the green truck shoot Sublett, despite having told the police on the night of the shooting that she had not seen the shooting.

> At the hearing, Bailey explained that when she heard the first shot, she went to her window and saw the green truck. The truck started to pull out of the parking spot, and then "the man fell out of the back seat and then his clothes was off before he got out of the car. Then the driver reached over and fired a gun. Then they rolled over him then they had left out." Bailey claimed that she had initially refused to come forward because she was scared.

> In ruling on the motion, the trial court indicated that after observing
> and carefully listening to Bailey, and comparing what she had said to
> the testimony at trial, Bailey's testimony would not have yielded a
> different result in a new trial. We cannot say that the trial court's
> decision was an abuse of discretion.

*State v. Marshall*, 175 Ohio App. 3d 488 at ¶¶ 71-75.

The Hamilton County Court of Appeals adjudicated this claim entirely under Ohio law.   It did not indicate that it understood it was deciding a federal constitutional question and indeed Marshall does not cite any Supreme Court precedent which requires the States to grant a new trial under any particular circumstances.   To the extent the court of appeals was deciding a question of Ohio law, this court is not authorized to second-guess that decision. This Court is not aware of any United States Supreme Court precedent requiring a state court to grant a new trial upon the presentation of a certain level of probative but newly-discovered evidence.

Ground Six should be dismissed without prejudice for failure to state a constitutional claim.

## Ground Seven:   Error in Sentencing

In his Seventh Ground for Relief, Marshall argues the state court imposed on him a sentence which is contrary to law.   This was Marshall's seventh assignment of error on direct appeal and was decided by the court of appeals as follows:

> In his seventh assignment of error, Marshall argues that the trial court
> imposed a sentence that was contrary to law. The court imposed a
> prison term of 15 years to life for murder in addition to a three-year
> term for an accompanying firearm specification; ten years for
> involuntary manslaughter with an additional one-year term for a
> firearm specification; 18 months for each count of trafficking in
> marijuana with an additional one-year term for a firearm

specification; and 12 months for possession of marijuana with an additional one-year term for a firearm specification. The court ordered several of the terms, including the terms for the firearm specifications, to be served consecutively, for an aggregate minimum term of twenty and one-half years in prison.

Marshall argues that the court erred in sentencing him for both murder and involuntary manslaughter because, according to Marshall, involuntary manslaughter is a lesser-included offense of murder. "Murder" is defined in R.C. 2903.02(A) as purposely causing the death of another. "Involuntary manslaughter" is defined in R.C. 2903.04 as causing the death of another as "the proximate result of the offender's committing or attempting to commit" a felony or a misdemeanor.

An offense may be a lesser-included offense of another only if (1) the offense carries a lesser penalty than the other; (2) the offense of the greater degree cannot, as statutorily defined, ever be committed without the offense of the lesser degree also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense. *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph three of the syllabus.

"The evidence presented in a particular case is irrelevant to the determination of whether an offense, as statutorily defined, is necessarily included in a greater offense." *State v. Kidder* (1987), 32 Ohio St.3d 279, 282, 513 N.E.2d 311.Under this test, "involuntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or misdemeanor." *Id.*; *see, also, State v. Lynch*, 98 Ohio St.3d 514, 2003 Ohio 2284, 787 N.E.2d 1185.

Thus, the trial court erred in separately convicting Marshall on the lesser-included offense of involuntary manslaughter. We reverse Marshall's involuntary-manslaughter conviction, but Marshall's aggregate sentence is unaffected because the trial court made the involuntary-manslaughter sentence concurrent with the murder sentence of 15 years to life in prison.

The court also separately sentenced Marshall for allied offenses of similar import. In *State v. Cabrales*, this court determined that possession of drugs in violation of R.C. 2925.11(A) and trafficking in the same drugs in violation of R.C. 2925.03(A)(2) were allied

34

offenses of similar import. *State v. Cabrales*, 1st Dist. No. C-050682, 2007 Ohio 857, discretionary appeal accepted, 114 Ohio St. 3d 1410, 2007 Ohio 2632, 867 N.E.2d 844.  Consequently, the trial court could have convicted Marshall of only one of these offenses. Instead, the trial court convicted him of both and imposed consecutive terms of incarceration.

We *sua sponte* set aside the multiple sentences imposed for the allied offenses and remand this case for the trial court to impose sentence on either possession of marijuana in violation of R.C. 2925.11(A) or trafficking in marijuana in violation of R.C. 2925.03(A)(2). But our reversal of the sentences is stayed pending the outcome of the Ohio Supreme Court's decision in *Cabrales*.

Next Marshall argues that his sentence was excessive. Following the Ohio Supreme Court's decision in *State v. Foster*, a trial court has full discretion to impose a sentence that is within the available statutory range, and the court no longer needs to make findings or provide reasons in support of such a sentence. *State v. Foster*, 109 Ohio St.3d 1, 2006 Ohio 856, 845 N.E.2d 470, paragraph seven of the syllabus.

In this case, the trial court imposed terms that were within the available statutory ranges for the offenses. Accordingly, we conclude that the sentence imposed was not excessive.

*State v. Marshall*, 175 Ohio App. 3d 488 at ¶¶ 76-84.

Marshall's entire argument of this claim on direct appeal was as follows:

**6. The sentence was excessive.**

Sentencing in Ohio is controlled by R.C. Section 2929.11 through 2929.14. The basic ranges for prison terms are outlined in Section 2929.14. Involuntary manslaughter is a lesser included offense of murder. *State v. Lynch* (2003)  98 Ohio St.3d 514,787 N.E.2d 1185. The trial court sentenced Marshall on both murder and manslaughter. The sentences were concurrent to each other.

Appellant's 20 1/2 years to life sentence was erroneous and excessive. The trial court erred in sentencing Marshall in this manner. Therefore, Marshall's sentence should be vacated or modified by this court.

(Appellant's Brief, Return of Writ, Doc. No. 15, Ex. 19, PageID 280.)   There is no suggestion in

35

this argument of any federal constitutional claim and the court of appeals did not advert to the United States Constitution in deciding this assignment of error.

Marshall did argue on appeal that involuntary manslaughter is a lesser included offense of murder under Ohio law.   The court of appeals accepted that argument and vacated the involuntary manslaughter conviction.   Marshall now argues that they should have vacated both convictions and remanded for a new trial on the theory that the jury should have been instructed that "if it found that Petitioner had committed murder, but additionally found the presence of a mitigating circumstance under involuntary manslaughter, it had to find the petitioner guilty of involuntary manslaughter rather than murder." (Reply, Doc. No. 37, PageID 3291, *citing State v. Duncan*, 154 Ohio App. 3d 254 (Ohio App. 1st Dist. 2003).

Marshall misreads *Duncan* which involved inconsistent verdicts of murder and **voluntary** manslaughter.   As the court of appeals explained in *Duncan*:

> From a comparison of the statutory definitions of murder and voluntary manslaughter, it is clear that voluntary manslaughter is an offense of inferior degree to murder, and not a lesser-included offense of murder. See, also, *State v. Rhodes* (1992), 63 Ohio St.3d 613, 617, 590 N.E.2d 261; *State v. Tyler* (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576.   The Ohio Supreme Court has held that "voluntary manslaughter is, by our prior definition, an inferior degree of murder." *See State v. Rhodes, supra,* at 617. The court has also held that, under the voluntary-manslaughter statute, "the jury must find a defendant guilty of voluntary manslaughter rather than murder if the prosecution has proven, beyond a reasonable doubt, that the defendant knowingly caused the victim's death, and if the defendant has established by a preponderance of the evidence the existence of one or both of the mitigating circumstances." *See State v. Rhodes, supra. See, also, State v. Wallace* (Dec. 31, 1996), 1996 Ohio App. LEXIS 5877, 1st Dist. No. C-950465.

154 Ohio App. 3d at ¶ 27.   In contrast to voluntary manslaughter, involuntary manslaughter is a lesser-included offense of murder.   As the *Duncan* court explained the distinction,

> The Ohio Supreme Court has articulated the distinction between an inferior-degree offense and a lesser-included offense. "An offense is an 'inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements which will generally be presented in the defendant's case." *See State v. Deem* (1988), 40 Ohio St.3d 205, 209, 533 N.E.2d 294.  In contrast, "an offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. *Id.*, paragraph 3 of the syllabus.

154 Ohio App. 3d at ¶ 26.   The element required for murder which is not required for involuntary manslaughter is that the killing was purposeful.   *See* Ohio Revised Code § 2903.04(B).

As the court of appeals held, involuntary manslaughter is a lesser included offense of murder, not an inferior degree of murder.   If Marshall is now claiming the jury was improperly instructed on making the distinction between murder and involuntary manslaughter, he is far too late.   He has not shown he requested an appropriate instruction, nor did he raise the lack of an appropriate instruction as a claim on direct appeal.   His citation of *Milanovich v. United States*, 365 U.S. 551 (1961), is inapposite for the same reason.   There the claim on jury instructions was preserved for appeal.

Marshall complains (Reply, Doc. No. 37, PageID 3291) that he was treated differently from the appellant in *State v. Griffin*, 175 Ohio App. 3d 325 (Ohio App. 1st Dist. 2008).   *Griffin*, however, is another case like *Duncan* which involved inconsistent verdicts of guilt for murder and **voluntary** manslaughter.

Marshall complains that the court of appeals erred by merging his murder and involuntary

manslaughter convictions (Reply, Doc. No. 37, PageID 3292). That is not what happened. Instead, the court of appeals reversed the involuntary manslaughter conviction. *State v. Marshall*, 175 Ohio App. 3d 488 at ¶ 80.

Marshall's Seventh Ground for Relief is without merit and should be dismissed.

## Ground Eight: Ineffective Assistance of Counsel

In his Eighth Ground for Relief as spelled out in his Reply, Marshall asserts his trial counsel was ineffective in the following ways:

1. Failure to raise "the affirmative approach of any kind of defense." (Reply, Doc. No. 37, PageID 3294). The Court reads this as an attempt by Marshall to repeat the claim made on appeal that "[c]ounsel failed to raise the affirmative defense of self-defense and/or defense of others." (Appellant's Brief, Return of Writ, Doc. No. 15, PageID 281)

2. Failure to challenge a juror who admitted to being a good friend and next door neighbor of a high ranking prosecutor in the Hamilton County Prosecutor's Office. (Reply, Doc. No. 37, PageID 3294).

3. Failure to argue that Sublett ha two guns on his person "even though Marshall told counsel before trial that the gun found in Subletts' [sic] pocket was not the gun used in the robbery. Especially since Washington admitted removing evidence from the crime scene. *Id*.

4. Failure to track down any witnesses, "even Ms. Bailey, who had pertinent information concerning the Petitioner's defense." *Id*.

5. Failure to do any investigation himself or hire an investigator. *Id*. at PageID 3295.

6.      Failure to employ a specialist to reenact the shooting to show that the driver was the shooter.

*Id.*

7.      Failure to use the DVD's from Marshall's trial which would have shown how many other robberies and different guns Sublett and Washington have.  *Id.*

8.      Failure to pursue the fact that Washington had the opportunity to remove a gun from the crime scene.  *Id.*

9.      Failure to request a lesser-included offense jury instruction. *Id.*

These instances will be referred to hereinafter as sub-claims one through nine.

Sub-claims one through four were raised on direct appeal (Appellant's Brief, Return of Writ, Doc. No. 15, PageID 281).   The court of appeals decided this assignment of error as follows:

### Ineffective Assistance of Trial Counsel

In his final assignment of error, Marshall argues that he was denied the effective assistance of trial counsel. To prevail on such a claim, Marshall must prove that trial counsel violated an essential duty and that he was prejudiced by that violation. *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L. Ed. 2d 674.18 A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.*

Marshall specifies four instances where counsel allegedly violated an essential duty: counsel's failure to raise the affirmative defenses of self-defense and defense of others; counsel's failure to remove a juror who was a neighbor and a friend of a high-ranking prosecutor in Hamilton County; counsel's failure to argue that Sublett had an additional gun that Washington had removed from the scene; and counsel's failure to locate Yolanda Bailey as an eyewitness prior to trial.

First, we hold that counsel engaged in sound trial strategy by not raising self-defense or defense of others to justify Marshall's shooting of Sublett. These defenses conflicted with the complete

defense Marshall presented--that he was not the shooter.

Second, counsel's failure to remove a juror who lived next to a chief assistant prosecutor does not support Marshall's claim. The juror's neighbor was not involved in the trial, and the juror unequivocally stated that he could be impartial.

Third, counsel's failure to argue that Sublett had two guns with him, one in his pocket and one in his hand, did not constitute ineffective assistance. Because Marshall's defense was that he was not the shooter, the number of weapons possessed by the victim was immaterial.

Finally, Marshall has failed to show that trial counsel's failure to locate Bailey amounted to a breach of a duty that prejudiced him. Bailey purposely avoided involvement in this case and told the police that she had not witnessed the shooting. And the trial court, in ruling on Marshall's motion for a new trial, determined that if Bailey had testified at trial, it was unlikely that the result would have been different.

Marshall has failed to show that counsel violated an essential duty that prejudiced him. Accordingly, we overrule the eighth assignment of error.

*State v. Marshall*, 175 Ohio App. 3d 488 at ¶¶ 84-90.

In deciding this assignment of error, the court of appeals applied the correct United States Supreme Court precedent, *Strickland v. Washington, supra.* The governing standard from *Strickland* reads

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a

40

> defendant makes both showings, it cannot be said that the conviction
> or death sentence resulted from a breakdown in the adversary process
> that renders the result unreliable.

466 U.S. at 687.   In other words, to establish ineffective assistance, a defendant must show both

deficient performance and prejudice.  *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130 S.Ct. 2250,

2255 (2010), *citing Knowles v. Mirzayance,* 556 U.S.111 (2009).

　　　With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177, 1184 (6th Cir. 1987). "The likelihood of a different result must be substantial, not just conceivable."  *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011), *quoting Harrington v. Richter*, 562 U.S. ___, 131 S. Ct. 770, 792 (2011).

Marshall has not shown any way in which the court of appeals application of *Strickland* to his first four sub-claims was objectively unreasonable.  Self-defense was inconsistent with the defense on which even now Marshall insists – that he was not the shooter.  The juror's unequivocal statement that he could be impartial would have prevented his removal for cause on the cited basis.  How many guns Sublett may have had and whether Washington could have

42

removed one of them along with the marijuana he took from the scene was irrelevant to Marshall's defense that he was not the shooter.   And although Ms. Bailey was eventually willing to testify, there is absolutely no showing that she would have been willing to testify at the time of trial.   She did admit that her fear led her to lie to the police about what she had seen.   There is no showing she would not have lied to Marshall's counsel as well.   Thus Marshall's first four sub-claims of ineffective assistance of trial counsel should be dismissed with prejudice because the state courts' decision on them is neither contrary to nor an objectively unreasonable application of clearly established United States Supreme Court precedent.

As to sub-claims five through nine, this Court cannot reach the merits because these claims are procedurally defaulted in that they have never been presented to the Ohio courts and could not now be presented for a number of reasons.   Under Ohio law, claims of ineffective assistance of trial counsel which can be shown from the trial record must be raised on direct appeal or they are barred from later presentation by *res judicata.   State v. Perry*, 10 Ohio St. 2d 175 (1967).   On the other hand, claims which depend on evidence outside the record can be presented in a petition for post-conviction relief under Ohio Revised Code § 2953.21.

Sub-claims eight and nine could have been argued on direct appeal from the trial record but were not.   As to Washington's possible removal of another gun from the crime scene, Washington could have been asked about that on cross-examination or – a safer course since trial counsel did not know what Washington would say – by arguing the opportunity.   And certainly the absence of a request for a proper lesser-included offense instruction could have been shown from the trial record.   Because these two claims were not raised on direct appeal, they are procedurally defaulted.

Sub-claims five, six, and seven would appear to depend on evidence which was not in the trial record.   Therefore they could have been presented in Marshall's petition for post-conviction relief.   Examination of Marshall's petition for post-conviction relief shows that none of these claims were raised there (Petition, Return of Writ, Doc. No. 15, Ex. 26, PageID 389-393).

Marshall's Eighth Ground for Relief should therefore be dismissed with prejudice.

### Ground Nine:   Actual Innocence

In his Ninth Ground for Relief, Petitioner claims he is actually innocent of the murder for which he stands convicted and sentenced.   However, most of his argument is directed to claimed error of the state courts in denying his motion for leave to file a delayed motion for new trial.

As noted above in the Procedural History section of this Report, Marshall requested and this Court granted a stay pending his exhaustion of the state court remedy of delayed motion for new trial.   The relevant state court documents were filed by Respondent as exhibits to the Supplemental Return of Writ (Doc. No. 33).   Marshall's Motion for Leave to File Delayed Motion for New Trial and/or Alternatively, Petition for Post-Conviction Relief is Exhibit 45 to the Supplemental Return. It was filed in the Common Pleas Court April 12, 2010. *Id*.   at PageID 2095. In it Marshall admits that he knew at the time of trial that Jason Jones, the driver of the Durango, had admitted to his sister, Shelia Marshall, asserted to be Jones' common-law wife, that Jones was the shooter.   *Id*.   at PageID 2095.   Marshall also admits he committed perjury at trial by identifying the driver as "D.C."   *Id*.   at 2096.   He offers his own affidavit and those of Jason Jones, Antje Jarrett, Shelia Marshall, and Latosha S. Williams to prove that Jones was the shooter.

*Id*.  He claims the Ohio onerous obligation of showing he was unavoidably prevented from discovering this evidence at the time of trial is unconstitutional.  *Id*.

In an attached Affidavit, Antje Jarrett avers that she is Marshall's mother and grandmother of Jason Jone's children.  *Id*.  at 2098.  She further avers that "jason jones came to my house after the shooting and told me in person that he shot junis sublett."  *Id*.

Shelia Marshall also provided an affidavit dated March 4, 2010, in which she claims cohabitation with Jason Jones and bearing his children "although we never made our marriage official."  She avers further that on the date of the murder, May 18, 2005, Jason Jones told her he was the shooter. *Id*.  at PageID 2099

Jason Jones' affidavit is dated more than a year earlier, February 7, 2009.  *Id*.  at PageID 2100.  In it he corroborates Marshall's account of what happened, to wit, that Marshall had his head tucked down between his legs at Sublett's order and Jones reached over Marshall and shot Sublett, then drove over him.  He does not confirm having admitted the shooting to Shelia Marshall or Antje Jarrett.  Latosha Williams, whose relationship to the other affiants is not disclosed, avers in her March 4, 2010, affidavit that Jones admitted the shooting to her on the day it happened.

Hamilton County Common Pleas Judge Jerome Metz was assigned the Motion because Judge Fred Nelson, who tried the case, was no longer on the bench.  Judge Metz filed a sixteen-page set of findings of fact and conclusions of law. (Supplemental Return, Doc. No. 33, Ex. 48, PageID 2107, et seq.)   Critical findings and conclusions include:

> 6.     Jason Jones has been convicted of involuntary manslaughter in the death of Mr. Sublett, but was acquitted of the charge of murder.

7.    Mr. Marshall knew at the time of the first trial of any claim he now makes that he was innocent because his co-defendant Jason Jones was the one who fired at or drove a truck over the victim, Mr. Sublett.

11.    With the exception of Jason Jones, none of these persons [the affiants] witnessed Junis Sublett's murder.   Jason Jones, having previously testified (along with Mr. Marshall) that he was not there, now says that he was, in fact, the shooter.

12. None of the affidavits filed by Mr. Marshall explains why or how he was prevented from finding out the facts he now claims are newly discovered. Four of the affiants are members of his own family. One of them was his now-acquitted co-defendant in the murder indictment. Mr. Marshall admits that he was himself present in the vehicle, to sell drugs, at the time of the shooting.   Obviously, if Mr. Jones was the shooter, that fact was known to Mr. Marshall from the very moment of the shooting.

13. James Marshall testified in both his own trial and that of Jason Jones that Jason Jones had not been present at the time of the shootings. If the current affidavits are true, then Mr. Marshall intentionally perjured himself in the two previous trials.

*Id*.  Judge Metz found that Marshall had missed the ordinary deadline for a motion for new trial, which would have been September 15, 2006, and had not shown he was unavoidably prevented from discovering the other evidence.   Judge Metz denied both the motion for new trial and the alternative petition for psot-conviction relief.   *Id*.   at PageID 2113-2114.   The Court of Appeals affirmed (Supplemental Return, Doc. No. 33, Ex. 55, PageID 2185, et seq.).

Marshall now complains that the trial court violated Ohio law by deciding the underlying motion for new trial without deciding whether he should be allowed to file it (Reply, Doc. No. 37, PageID 3296).   He raised that question on appeal and the court of appeals found no error.   Since that is purely a question of Ohio law, this Court should not reach it.   And as noted above with

46

respect to Marshall's first motion for new trial to present Yolanda Bailey, there is no federal constitutional right to a new trial.

Nor is there any free-standing federal constitutional right to be released from custody because one is actually innocent of the crime for which one stands incarcerated. *Herrera v. Collins*, 506 U.S. 390 (1993).  A person who is actually innocent may use proof of that fact to excuse some procedural default which prevents the habeas court from reaching the merits of another constitutional claim. *Murray v. Carrier,* 477 U.S. 478 (1986).  To prevail on an actual innocence claim, the petitioner must show that it is more likely than not that no reasonable juror would have found   him guilty beyond a reasonable doubt' in the light of the new evidence he or she is tendering.   In reaching this conclusion, the habeas court may need to make credibility determinations.   *Schlup v. Delo*, 513 U.S. 298 (1995), adopting standard from *Murray v. Carrier*, 477 U.S. 478 (1986).

The materials offered by Marshall do not satisfy the actual innocence standard of *Schlup*. In the first place, they are not "new" evidence.  Judge Metz was clearly correct in finding that virtually all of this evidence was known by Marshall before his trial.  Secondly, in making the required credibility determination, this Court notes that two of the affidavits are from confessed perjurers, Marshall and Jones, both of whom testified not once but twice that Jones was not there at the shooting.   Jones has, of course, nothing to lose now by making the admission; his acquittal for murder protects him from being retried by virtue of the Double Jeopardy Clause.

Marshall's Ninth Ground for Relief is utterly without merit and should be dismissed with prejudice.

**Ground Ten: Error by the Trial Judge in his Findings**

In his Tenth Ground for Relief, Marshall argues Judge Metz made assumptions about Petitioner and his family in denying the second motion for new trial. Specifically, he says "[t]here is no reason for the Judge who was not the Trial Judge to give his own opinion and state or believe there is a scheme occurring without no proof. The Judge has pointed to no affiants that even remotely indicated that affiants were admitting they were part of any scheme as the Judge stated." (Reply, Doc. No. 37, PageID 3298.)

Marshall is mistaken. He himself admitted he was under family pressure to perjure himself to attempt to obtain Jones' acquittal and that he did so. Judge Metz's inference that there was a scheme is amply supported by evidence Marshall himself presented. In any event, Marshall has not shown any relevant constitutional claim. Judge Metz as the trial judge assigned to the second new trial motion was entitled, indeed required, to make credibility determinations in deciding the motion. Ground Ten should be dismissed with prejudice.

**Conclusion**

In accordance with the foregoing analysis, it is respectfully recommended that the Petition herein be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied any requested certificate of appealability and this Court should certify to the Sixth Circuit Court of Appeals that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

September 4, 2012.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).